IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

B.W., by his parents WALTER S. WEBSTER )
and DANIELLE CORRIGAN-WEBSTER, )
)
Petitioners, )
)
v. ) 1:09CV00970
)
DURHAM PUBLIC SCHOOLS, )
)
Respondent. )

**MEMORANDUM OPINION AND ORDER**

CATHERINE C. EAGLES, District Judge.

Danielle and Walter Webster brought suit on behalf of their disabled son, B.W., against Durham Public Schools (the School) under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. The Websters allege that the School failed to provide their son with a free appropriate public education (FAPE) by not including a one-on-one aide as a related service in his individualized education plan (IEP). The Websters also allege that the School refused to discuss the inclusion of a one-on-one aide during the development of the IEP, which the Websters contend was a procedural violation of the IDEA.

Having exhausted their administrative appeals, the Websters seek relief from the District Court. The Court concludes that the IEP was adequate to provide a FAPE to B.W. The Websters' motion for judgment on the pleadings, (Doc. 28), should be denied, and judgment for the respondent School is appropriate.

I. **FACTUAL BACKGROUND**

B.W. is a child with autism, a developmental disorder characterized by problems in communication skills, social interaction, and motor control. B.W. was first placed with the

School at Pearsontown Elementary School in February 2007, after he turned 3 years old. (Testimony of Danielle Corrigan-Webster, Tr. Vol. I at 49:7-15; 86:11-16.) B.W.'s classroom at Pearsontown was designed for children with autism and contained a maximum of six students. (Testimony of Patricia Henson, Tr. Vol. IV at 662:10-18.)

When B.W. entered Pearsontown, an IEP was developed for him. The initial IEP provided B.W. with various services including sessions with a speech-language pathologist and an occupational therapist. (Resp. Ex. 4-006.) The goals of this IEP were to increase B.W.'s response to teacher-directed activities, to improve play skills, and to improve language skills. (*Id.* at 4-002-004.)

In the Pearsontown classroom, B.W. improved his social skills. By the fall of 2007, he could respond to directions, he began sharing toys with classmates, and he interacted better with his peers. (Testimony of Patricia Henson, Tr. Vol. IV at 687:16-25; 688:1-16; 694:16-22.) B.W.'s language had improved as well. (*Id.* at 713:9-13.)

B.W.'s improvement under his first IEP prompted discussions about moving him from Pearsontown, where B.W.'s options for social interactions with other peers were limited. (*Id.* at 714:4-16.) The Websters asked an independent specialist to examine B.W. as part of the process to update B.W.'s IEP. (*Id.* at 719:25; 720:1-4.) Dr. Perlman, the independent specialist, observed B.W. in the Pearsontown classroom in December 2007, (*Id.* at 722:1-17), and also observed B.W. at the Websters' home. (Petitioner ex. 3 at 4.) Dr. Perlman also conducted various tests with B.W. which lasted for about 4 hours. (*Id.*)

On January 8, 2008, an IEP meeting was held. (Testimony of Patricia Henson, Tr. Vol. IV at 734:17-18.) Patricia Henson, B.W.'s teacher at Pearsontown, Sheryle Metcalf, and Dr. Janice Blanck, Director of Programs for Durham Public Schools, were present at the meeting,

and Mr. Webster participated by telephone. (*Id.* at 735:6-10.) A "short term" IEP was developed for B.W. at that meeting because the team was waiting for Dr. Perlman's report before creating a final year-long IEP. (*Id.* at 736:16-19.) Discussions also began about moving B.W. into another classroom next to a Title I classroom where he could receive the benefits of regular preschool as well as special instruction. (*Id.* at 715:11-22.) The IEP team decided to postpone assigning B.W. to a different school until it had evaluated Dr. Perlman's report. (Testimony of Patricia Henson, Tr. Vol. IV at 743:4-14.)

Dr. Perlman's report was provided on January 21, 2008. Dr. Perlman recommended that the IEP team include a minimum of 25 hours per week of one-on-one intensive applied behavioral analysis (ABA) therapy in the IEP.[1] (Pet. Ex. 3 at 16.)

After receiving Dr. Perlman's report and recommendation, Mr. Webster informed the School that he would enroll B.W. in the Center for Autism and Related Disorders (CARD) in order to receive ABA therapy because the School did not have and could not train someone to immediately provide the necessary therapy to B.W. (Pet. Ex. 8.) The Websters began sending B.W. to CARD for treatment in February of 2008. (Testimony of Walter Webster, Tr. Vol. III at 535:24-25.)

On March 14, 2008 another IEP meeting was held. (*See generally* IEP Tr. at 6.) In attendance were B.W.'s parents, Lori Stuart, Patty Henson, Sheryle Metcalf, Janice Blanck and Carolyn Waller, among others. (IEP Tr. at 1-2.) The Websters wanted B.W. to have ABA

---

[1] ABA therapy is "a form of treatment for autistic preschoolers developed by Dr. Ivar Lovaas [which] consists of breaking down activities into discrete tasks and rewarding the child's accomplishments." *Jaynes v. Newport News Sch. Bd.*, 13 F. App'x. 166, 170 n.3 (4th Cir. 2001); *see also Bd. of Educ. of the Cnty. of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 602 (S.D. W. Va. 2000) (describing Lovaas method).

3

therapy, and the IEP team agreed that it would be "relying on ABA all day long" for B.W. (IEP Tr. at 138:18-22.)

The Websters also sought more hours of ABA therapy for B.W. because, in their view, "less than 25 to 30 hours a week tends to be almost ineffective." (IEP Tr. at 139:1-3.) They also requested a one-on-one aide (also known as a shadow aide) to assist B.W. in the classroom. (*See* IEP Tr. at 140-148; Testimony of W. Webster, Tr. Vol. III at 537.) The Websters wanted a shadow aide because Dr. Perlman recommended it, but also because they wanted to ensure that B.W. would be individually supported in the new classroom settings being contemplated – a developmental needs (DN) classroom for half the day and a larger Title I classroom for half the day. (*See* IEP Tr. generally and at 165-171; s*ee* Testimony of Sheryle Metcalf, Tr. Vol. V at 956:6-14.)

Ms. Waller, an attorney for Durham Public Schools, told the Websters that staffing is not an IEP team decision, but rather an administrative decision. (IEP Tr. at 156:20-157:2.) Ms. Waller said the school district's approach was to identify B.W.'s needs as he progressed in the classroom, and that if it was clear more staffing was needed to help B.W., then those changes could be made over time. (*Id*. at 158:9-17.)

Mr. Webster argued that staffing decisions including decisions on shadow aides were made in IEPs; Ms. Waller said "it never happens." (*Id*. at 159:4-8.) After Ms. Waller informed Mr. Webster of the policy, she and other school employees refused to discuss further the possibility of including assignment of a shadow aide to B.W. in the IEP. (*Id.* at 162:6-11.)

Ultimately, the IEP provided for: 1) 4 ½ hours of special education three times a week in a DN classroom; 2) three hours of special education twice a week in a Title I classroom; 3) thirty minutes of speech/language twice a week; and 4) thirty minutes of occupational therapy once a

4

week. (Resp. Ex. 1 at 9.) The program offered to B.W. was ABA-intensive throughout the school day, (IEP Tr. at 138:18-22), but not always in a one-on-one setting. (Testimony of Lori Stuart at 874-877 and 896-900.) The Websters refused to accept this plan because it did not provide for a shadow aide; instead they continued to use the services at CARD.

## II. PROCEDURAL HISTORY

The Websters filed a petition for a contested case hearing on August 3, 2008, before the North Carolina Office of Administrative Hearings. The Websters asserted that the March 2008 IEP did not provide B.W. with a free appropriate public education (FAPE) and sought reimbursement for past and future services provided by CARD. The petition was heard by Chief Administrative Law Judge (ALJ) Julian Mann, who, on August 17, 2009, ruled that the Websters were not entitled to relief.

The Websters filed an administrative appeal and State Review Officer (SRO) Joe Walters affirmed the ALJ's decision on October 16, 2009. After exhausting their administrative remedies, the Websters brought this action pursuant to the IDEA. 20 U.S.C. § 1415(i)(2).

Both the ALJ and the SRO described the issues before them as (1) whether the IEP developed in March 2008 was designed to provide B.W. with an opportunity for a free appropriate public education; (2) whether the School's refusal to discuss assigning a "shadow aide" during the March IEP meeting constituted a procedural violation; and (3) whether the parents' choice of CARD services was appropriate under the IDEA.

## III. LEGAL FRAMEWORK

The IDEA "was enacted to ensure that all children with disabilities have access to a 'free appropriate public education' to meet their unique needs." *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 942 (4th Cir. 1997) (quoting 20 U.S.C. § 1400 (c)). States which receive federal funds

5

under the IDEA must provide a FAPE to all students. 20 U.S.C. § 1412(a)(1)(A). The IDEA also imposes a number of procedural protections for families of disabled children, including the right to participate in the development of a written IEP for the child and the right to administrative and judicial review. 20 U.S.C. § 1415(a).

A FAPE includes "special education and related services" which "(1) have been provided at public expense and under public supervision and direction; (2) meet the standards of the state educational agency; (3) include an appropriate preschool, elementary, or secondary school education in the state involved; and (4) are provided in conformity with the individualized education program." *Gadsby*, 109 F.3d at 942; *see* 20 U.S.C. §1412. States can satisfy this requirement for a free appropriate public education by providing a program "tailored to the unique needs of the . . . child." *Barnett by Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 150 (4th Cir. 1991). An appropriate education is one which "allows the child to make educational progress." *Id.* at 153.

In order to accomplish the requirement to provide a FAPE, each child must have an IEP. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). The IEP is a "written statement for each child with a disability" that outlines, among other things, "the special education and related services and supplementary aids and services . . . to be provided to the child." 20 U.S.C. § 1414 (d) (1) (IV). "IEPs are the primary vehicle through which schools provide a particular student with a FAPE." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 319 (4th Cir. 2009).

When decisions are made affecting a child's education under the IDEA, procedural safeguards are in place to ensure that the parents or guardians participate in the decision-making process, are notified of the school's decisions regarding the child's education, and have the opportunity to contest the decisions. *See* 20 U.S.C. §1415(a); *see also Gadsby*, 109 F.3d at 944.

When the parent or guardian contests an educational decision, the parent or guardian has "a right to an impartial due process hearing." *Gadsby*, 109 F.3d at 944; *see* §1415(f). In North Carolina, the due process hearing is heard by an ALJ and that decision may be appealed to the State Board of Education, which will assign an SRO with knowledge of special education. *Cone v. Randolph Cnty. Sch. Bd. of Educ.*, 657 F. Supp. 2d 667, 670 (M.D.N.C. 2009).

Under the IDEA, "any party aggrieved by a decision reached at a due process hearing of the state educational agency" has a "right to bring a civil action in a United States district court." *Sch. Bd. v. Brown*, 769 F. Supp. 2d 928, 936 (E.D. Va. 2010); *see* 20 U.S.C. § 1415 (i)(2). The court reviewing the decision of the state educational agency is "obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist.*, 303 F.3d 523, 530-531 (4th Cir. 2002). District courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Hartmann by Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir. 1997) (quoting *Rowley*, 458 U.S. at 206). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on a preponderance of the evidence, shall grant relief as the court determines appropriate." 20 U.S.C. § 1415 (i)(2)(C). Once due weight is given to the administrative decision, a reviewing court "may grant summary judgment based upon the administrative record." *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554, 561 (E.D. Va. 2009).

"In evaluating the administrative findings, findings of fact which are regularly made are taken to be prima facie correct." *Brown*, 769 F. Supp. 2d at 936 (internal quotation marks omitted). To determine whether a finding was regularly made, a court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the

methods employed." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). The petitioners, as challengers of the IEP, have the burden of proof in the administrative hearing, as well as before the district court. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

## IV. DISCUSSION

The Supreme Court has established a two-step inquiry for federal courts evaluating a state administrative proceeding under the IDEA. *Rowley*, 458 U.S. at 206-207. First, the court must determine whether the School complied with the procedural requirements under the IDEA. *Id.* at 206. Second, the court must determine whether the substance of the IEP is "reasonably calculated to enable the child to receive educational benefits." *Id.* at 207. If both requirements are met, then the School has complied with the IDEA. *Id.* The Court will begin, then, with the procedural dispute.

### a. Procedural Violations under the IDEA and the Refusal to Discuss Shadow Aide

The Fourth Circuit has held that "under our circuit precedent, a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE before the child and/or his parents would be entitled to reimbursement relief" even if the violation "interfere[s] with the parents' ability to participate in the development of their child's IEP." *DiBuo ex rel. DiBuo v. Bd. of Educ.*, 309 F.3d 184, 190-91 (4th Cir. 2002); *see also A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 n.7 (4th Cir. 2007) (explaining that procedural violations are subject to "harmless" standard).

The Websters contend that the School committed a procedural error under the IDEA when they refused to discuss the inclusion of a shadow aide during the March 2008 discussion of B.W.'s IEP. The School does not challenge that it refused to discuss providing a shadow aide in

8

the IEP in March 2008. Instead, the School claims that its refusal does not amount to a procedural violation.

The IDEA gives the parents the right to be involved in the decision-making process about an IEP. The Supreme Court has observed that "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process." *Rowley*, 458 U.S. at 205. "Parents may participate in the IEP development process and may challenge IEPs they believe are inadequate." *M.S.*, 553 F.3d at 319. If there is a procedural violation, then the Court must determine whether the violation resulted in the loss of an educational benefit for B.W. or whether the violation deprived the parents of the right to meaningfully participate in the development of B.W.'s IEP. *See DiBuo*, 309 F.3d at 190.

The SRO held that Respondent committed a procedural violation, but that the violation was minor. (SRO Decision at 21-22 ¶ 14.) The Court agrees that a procedural violation occurred. Even if inclusion of a shadow aide is not a related service, there is "an obligation on the part of school officials to, at least, consider parental views." *TB v. Warwick School*, 2003 U.S. Dist. LEXIS 27136, at *42 (D.R.I. June 6, 2003). This obligation "is implicit in the requirement that parents have an opportunity to participate in the process of evaluating and placing their child." *Id.* By refusing to consider including a shadow aide in the IEP, the Websters' procedural rights were violated. Since there was a procedural violation, the next question is whether the violation deprived the parents of the rights to meaningfully participate in the development of B.W.'s IEP. *See Dibuo*, 309 F.3d at 190. The Court concludes that it did not.

It appears accurate to say that the school officials at the March IEP meeting refused to consider including a requirement in the IEP that B.W. have a shadow aide. The attorney for the school system who attended the meeting took the position that staffing was not a necessary part of the IEP. It was the position of the school officials that after a student's present level of performance, needs, goals, and objectives were established in the IEP, the school administration would determine the appropriate level of staffing required to meet those goals and objectives. The written IEP as finalized after the March IEP meeting was silent as to staffing issues and did not mention a shadow aide.

It is not accurate to say, however, that the school officials refused to discuss staffing levels or address the parents' concerns at all. While these details were not included in the IEP, it is undisputed that as a result of the IEP meeting, the School made some staffing changes to the way the IEP would be implemented. For example, in order to accommodate the Websters' request for additional assistance in the larger classroom setting, the School changed B.W.'s time in the Title I classroom from morning to afternoon to allow the DN classroom teaching assistant to go with B.W. to the Title I classroom. (Testimony of Danielle Corrigan-Webster, Vol. III at 477:19-25; 478:1-10; Testimony of Sheryle Metcalf, Vol. V at 957:17-23.) Ms. Stuart recommended that B.W.'s March 2008 IEP be implemented with B.W. in a group of one staff member (classroom staff or a related service provider) to no more than three students. (Testimony of Lorelei Stuart, Vol. V at 894:13-24; IEP Tr. at 171.)

On the one hand, if these kinds of staffing decisions were discussed and, apparently, made at the meeting, it is not clear why the group could not make a decision about the parents' request for a shadow aide. On the other hand, none of the staffing decisions were included in the

10

Case 1:09-cv-00970-CCE-LPA   Document 34   Filed 06/20/12   Page 10 of 16

written IEP, which is consistent with the School's position that staffing decisions were separate and apart from the development of the IEP itself.

It is clear from reviewing the record that the School disagreed with the parents' view that a shadow aide was necessary. While the IEP team said it would not consider staffing at the IEP meeting, it in fact did so, and the reason a shadow aide was not approved was because the School did not think it was necessary and believed it would interfere in meeting many of the IEP's socialization goals. (*See id.* at 902:3-18; 950:6-22.)

Staffing levels would certainly seem to be an appropriate topic for an IEP in some cases, and the Court sees no reason for a school to adopt an absolute prohibition. That does not mean, however, that there was an error in this case. As the evidence and the opinions of the ALJ and the SRO make clear, staffing issues were fully discussed at the IEP meeting, and the School decided against a full time one-on-one aide for the time-being, while leaving open the possibility of more one-on-one time if B.W.'s progress was not good. Moreover, the IEP team also considered the reports of Dr. Perlman, which contained extensive discussion of the need for a shadow aide and the CARD services reports provided by the Websters. Even if not explicitly discussed in detail, the information concerning a shadow aide was considered by the IEP team by virtue of Dr. Perlman's report. Although the Petitioners were not pleased that the consideration of a shadow aide did not take the form they wanted, there is ample evidence from the administrative record that the Websters' position on the need for a shadow aide was known to the IEP team, communicated in full to the IEP team, and considered by the IEP team.

### b. Denial of a Shadow Aide and a Free Appropriate Public Education

The next step in the inquiry is whether the School provided B.W. with a FAPE. The Websters contend that a shadow aide for B.W. is a "related service" required under the statute,

11

and that because the School refused to provide a shadow aide for B.W., he did not receive a FAPE. The School contends that the Websters' request for a one-on-one assistant was not a related service but rather was an element of their methodological preferences for their child's education. The SRO evaluated the arguments of both parties and concluded that B.W. was not denied a FAPE because: 1) the Websters never established that use of a shadow aide was a related service under the IDEA, (SRO Decision at 22 ¶ 15); and 2) the School created an IEP that was reasonably calculated to enable B.W. to receive benefits. (*Id.* at 21 ¶¶ 8-9.) The Court reviews the SRO decision by a preponderance of the evidence, giving the SRO's findings and conclusions "due weight." *Rowley*, 458 U.S. at 205-206.

The purpose of the IDEA is to provide every child with "a basic floor of opportunity." *Id.* at 201. The inclusion of related services is part of providing a free appropriate public education. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1527 (9th Cir. 1994) ("Under the IDEA, a free appropriate education includes not only special education, but also related services.") (internal quotation marks omitted). The statute defines "related services" to mean "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A).

The Websters bear the burden of "proving that the IEP was substantively deficient." *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 679 (4th Cir. 2007); *see also Spielberg ex rel. Spielberg v. Henrico Cnty. Pub. Sch.*, 853 F.2d 256, 258 n.2 (4th Cir. 1988) (noting that the burden is on the party challenging the hearing officer's decision). The Websters have failed to meet this burden.

Here, the Websters assert that without a shadow aide, B.W. would not get the full benefit of ABA programming. The record is clear, however, that the School IEP team indicated that it would, in fact, consider increasing staffing to meet B.W.'s needs if necessary. The record shows that the School proposed placing B.W. in the new classroom setting and evaluating whether additional staffing was needed after a few weeks.

The Supreme Court in *Rowley* addressed staffing levels. In *Rowley,* a hearing-impaired student alleged that the defendants denied a FAPE by not assigning a sign language interpreter as a provision of the IEP. *Rowley*, 485 U.S. at 184-85. The Court held that a FAPE was not denied to the student even though an interpreter was not provided. The Court held that "[i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Id.* at 200; *accord MM*, 303 F.3d at 527. Because the school did provide the child with "personalized instruction and related services", the Court upheld the school's decision not to provide an interpreter. *Rowley*, 458 U.S. at 209-10.

The Court finds no authority for the proposition that the School is precluded from including a one-on-one aide in an IEP. In fact such provisions are not uncommon in the Fourth Circuit. *See J.P. v. County Sch. Bd*., 516 F.3d 254, 258 (4th Cir. 2008) (recounting evidence that the "IEP provided for an instructional aide to be assigned to [child] exclusively" and that the "IEP stated that the aide would receive training in methods that are proven to work with autistic children") (internal quotation marks omitted); *M.C.E. v. Bd. of Educ. of Frederick Cnty.*, No. RDB-09-3365, 2011 U.S. Dist. LEXIS 74266, * at 12 (D. Md. July 11, 2011) (noting that "[a]fter the October 20, 2008 IEP meeting, [the school district] hired an instructional aide whose sole purpose was to keep [child] on task."); *Manalansan v. Bd. of Educ. of Baltimore City*, No. AMD

01-312, 2001 U.S. Dist. LEXIS 12608 *at 20 (D. Md. Aug. 14, 2001) (noting that "the team again considered the Parent's request for a program aide, and added such a requirement to the IEP"); *Cavanagh v. Grasmick*, 75 F. Supp. 2d 446 n.9 (D. Md. 1999) (noting that individualized instruction is provided "where called for by the IEP"); *cf. Laster v. D.C.*, 596 F. Supp. 2d 5, 7 (D. D.C. 2009) (appearing to refer to a one-on-one aide as a "related service").

B.W. was not entitled to a shadow aide simply because a shadow aide may be a related service in some circumstances. In fact, at least one other court in this Circuit has held that the inclusion of a trained one-on-one aide "went beyond what was required under the statute." *CM ex rel. JM v. Bd. of Educ.*, 85 F. Supp. 2d 574, 593 (W.D.N.C. 1999). Certainly there was evidence from which the ALJ or the SRO could have concluded that a shadow aide was appropriate. However, the evidence to the contrary was substantial, and the problems with that evidence which the Websters identify are not of such a nature as to make that evidence unreliable.[2] The School chose an ABA-based approach with significant supervision and interaction by trained teachers and teachers' aides and it provided substantial services directed towards improving B.W.'s speech. Moreover, the IEP team reasonably believed that a shadow aide would interfere with the development of B.W.'s social skills.

While a school system "must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, . . . the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential." *Hartmann*, 118 F.3d at 1001 (internal quotation marks omitted). The IDEA is "intended to provide a satisfactory level of educational opportunity, not the best education that

---

[2] It is particularly difficult to understand Petitioners' argument that evidence concerning B.W.'s progress under previous IEPs was inadmissible. The statute uses the word "progress" numerous times, and it makes no sense to disregard the progress a student has been making when forming a plan for the future.

14

money could buy." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 319 (4th Cir. 2004). The IEP was "specially designed to meet the unique needs" of B.W. *See Barnett*, 927 F.2d at 152-53. Because the IEP was designed for B.W.'s benefit, a FAPE was offered.

Finally, the Websters contend that even if the Respondent's actions met the federal standard, a higher standard is required in North Carolina under *Leandro v. State*, 346 N.C. 336, 347, 488 S.E.2d 249, 255 (1997). The Fourth Circuit has found that "North Carolina apparently does require more than the [IDEA]. The special education program must provide the child with an equal opportunity to learn if that is reasonably possible, ensuring that the child has an opportunity to reach her full potential commensurate with the opportunity given other children." *Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 983 (4th Cir. 1990); *accord CM v. Bd. of Pub. Educ.*, 184 F. Supp. 2d 466, 489 (W.D.N.C. 2002). Thus, the "federal court must determine whether an IEP meets the requirements of state law if the state requires a level of substantive benefit greater than that required under federal law." *Denton*, 895 F.2d at 982-83.

The SRO evaluated this case under both the federal standard and the North Carolina standard, (SRO Decision at 24 ¶ 25), and concluded that the IEP met the North Carolina standard. The Court finds the decision of the SRO to be well-reasoned and thorough, and agrees with his conclusion. Even though North Carolina has a higher standard, it does not require the School to develop a "utopian educational program" for B.W. *Harrell v. Wilson Cnty. Sch.*, 58 N.C. App. 260, 265, 293 S.E.2d 687, 691 (1982). The Websters have not identified any authority for the proposition that *Leandro* requires the result they seek.

### c. Appropriateness of CARD Placement and Reimbursement

"When a state receiving IDEA funding fails to provide a FAPE, the child's parent may remove the child to a private school and then seek tuition reimbursement from the state."

*Lawson*, 354 F.3d at 320. "The parent may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." *Id.* As has already been discussed, *supra*, the IEP was not inadequate to offer B.W. a FAPE. Therefore, the Websters are not entitled to reimbursement for their private placement of B.W.

## V.     CONCLUSION

The Court concludes that the findings of the administrative agency were regularly made. After giving the decisions due weight, the Court concludes that the School committed a procedural violation under the IDEA, but it was so minor that it did not impact the Websters' meaningful participation in the development of their child's IEP. The Court also finds that the program offered by the Durham Public Schools was designed to benefit B.W., even though it did not provide for a shadow aide. Therefore, the Petitioners' motion for judgment (Doc. 28) is **DENIED** and judgment shall be entered for the Respondent.

This the 20th day of June, 2012.

_____
UNITED STATES DISTRICT JUDGE